# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

In re:

Felda Plantation, LLC,

      Debtor.

_____/

Chapter 11

Case No. 11-14614

Judge

## MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ORDER AUTHORIZING INTERIM AND PERMANENT USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION

### (Emergency Hearing Requested)

Felda Plantation, LLC ("Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case, by and through its undersigned proposed counsel, hereby moves (the "Motion") the Court pursuant to sections 105(a), 361 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the Debtor to utilize cash collateral on an emergency interim basis and, thereafter, on a permanent basis and granting adequate protection  In support of this Motion, the Debtor respectfully states as follows:

### BACKGROUND

1.      On July 29, 2011 (the "Petition Date"), Debtor commenced its case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      Debtor is continuing in possession of its properties and assets and is operating and managing its business as debtor-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in the case.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### Debtor and Debtor's Business

4. Debtor, formerly known as Old Corkscrew Plantation VII, LLC ("OCP VII"), is a Florida limited liability company that owns and operates a citrus grove consisting of approximately 793 acres of Valencia orange trees and 87 acres of red grapefruit trees in Felda, Hendry County, Florida. In typical seasons – absent weather, pest or disease related problems – the Debtor's grove is among the highest producing citrus groves in the region, yielding in excess of 400 boxes of oranges per acre at an average of 7.0 pound/solids (sugar content), which is the standard measure of sale for juice oranges. There are no known underlying aggregate materials of value at the Debtor's grove; the primary value is in the grove itself and not in any particular mineral rights.

5. The Debtor has no employees. Corkscrew Plantation VII, Inc. ("Corkscrew"), through its President, Franz Rosinus, serves as Managing Member of the citrus grove and retains independent contractors to complete necessary operational tasks. Arcadia Citrus Enterprises ("Arcadia"), owned by Brian Bartholomew, provides the vast majority of crop husbandry services for the Debtor, including planting, insect and disease control, harvesting, and other "care take" and maintenance services.

6. The Debtor is owned by its three members as follows: Corkscrew (32.33%), Four West V, LLC ("Four West") (64.67%), and BB Citrus Holdings, L.L.C. ("BB Citrus") (3%) (collectively, the "Members"). The ownership of the Members and the respective principals

thereof are as follows:  Corkscrew, Franz Rosinus President, owned 100% by the Franz Rosinus Grantor Trust of 2006; Four West, Scott Westlake Manager, owned 80% by Four West, LLC and 20% by Mark Vogt; and BB Citrus, Brian Bartholomew Manager, owned 100% by Brian Bartholomew.  Certain of the Members are also owners in part of certain affiliates of the Debtor which are subject to separate Chapter 11 bankruptcy cases pending in this district, including Old Corkscrew Plantation, LLC; Old Corkscrew Plantation II, LLC; Old Corkscrew Plantation III, LLC; Old Corkscrew Plantation IV, LLC; Old Corkscrew Plantation V, LLC; and Old Corkscrew Plantation VI, LLC (collectively the "OCP Entities").

7.      For the Debtor, earnings before income tax, depreciation, and amortization (EBITDA) – *and before debt service* – for recent years were approximately as follows:  2008, $1.5M; 2009, $62,000; and 2010, $1.6M (prior to reallocation of costs and expenses to the OCP Entities, which resulted in an increase to approximately $3.7M).  Debt service for the same period was approximately as follows:  2008, $1.1M; 2009, $900,000; and 2010, $863,000. Depreciation and amortization for the three-year period were approximately as follows: 2008, $1.7M; 2009, $1.7M; and 2010, $1.8M.

8.      Starting in the Fall of 2011, the Debtor has in place a five-year contract with guaranteed floor prices for the purchase of its entire orange production at very favorable rates and also requiring payment of certain "rise payments" be made to the Debtor upon certain increases in the market price of oranges.

9.      Debtor seeks bankruptcy protection so that it can maintain operations while restructuring its financial obligations and assessing other alternatives pertaining to the disposition of its operations and assets.

## LOANS TO DEBTOR

10.     Debtor's secured lender is M&I Marshall & Ilsley Bank ("M&I Bank"), which has been acquired by the Bank of Montreal. Debtor is indebted to M&I Bank pursuant to a $17.6 Million note that is secured by certain assets of the Debtor. Debtor is also a co-debtor to M&I Bank together with the OCP Entities pursuant to a $40 million note, a $20 million note and a $5 million note (collectively the "Joint Debt"), which obligations are secured by certain assets of the Debtor and the OCP Entities. The balance of the Joint Debt as of the Petition Date is approximately $54,434,354. Among the Debtor and the OCP Entities, the Debtor is responsible for payment of an amount not greater than approximately $1.3 million of the $5 million note and the remaining portion of the Joint Debt is appropriately the responsibility of the OCP Entities on an inter-company basis.

11.     On March 27, 2006, OCP VII (n/k/a Felda Plantation, LLC, the Debtor), executed an Amended and Restated Note in the principal amount of $17,600,000 (as subject to further modification, the "$17.6 Million Note"). The full principal amount is owed pursuant to the $17.6 Million Note.

12.     On August 1, 2006, the OCP Entities and OCP VII (n/k/a Debtor) executed (i) an Amended and Restated Term Note in the principal amount of $40,000,000 payable to M&I Bank (as subject to later modification, the "$40 Million Note"), and (ii) a Term Note in the principal amount of $20,000,000 payable to M&I Bank (as subject to later modification, the "20 Million Note"). Upon information and belief the principal amount of $33,434,354 is owed pursuant to the $40 Million Note and the principal amount of $16,000,000 is owed pursuant to the $20 Million Note.

CLEVELAND/405774v.1

13.     On August 28, 2009, the OCP Entities and OCP VII (n/k/a Debtor) executed an Amended and Restated Promissory Note in the principal amount of $5,000,000 payable to M&I Bank (as subject to later modification, the "$5 Million Note"). The full principal amount is owed pursuant to the $5 Million Note.

14.     Payment of the $17.6 Million Note is secured by a Mortgage dated January 18, 2006, as subject to certain modifications on March 27, 2006 and October 28, 2008 (the "Modified Mortgage"), from Debtor in favor of M&I Bank, pertaining to the Debtor's real property and providing for the grant of a mortgage on the property, the grant of a security interest to the extent of personal property interests, the assignment of leases and rents, and the assignment of a certain fruit processing agreement. The Modified Mortgage also secures payment of the $5 Million Note.

15.     As part of the security for the $40 Million Note and the $20 Million Note, the OCP Entities and Debtor entered into an Assignment of Fruit Contracts dated August 1, 2006 in favor of M&I Bank pursuant to which all right, title and interest in all contracts, agreements or purchase orders pertaining to any fruit, fruit products, farm products or agricultural products grown on certain real property (including Debtor's grove) and all income, revenue and profits therefrom were assigned to M&I Bank.

16.     Also as part of the security for the $40 Million Note and the $20 Million Note, Old Corkscrew Plantation VI, LLC ("OCP VI") and Debtor entered into an Assignment of Rents and Leases dated August 1, 2006 in favor of M&I Bank, pursuant to which all leases concerning certain real property (including Debtor's grove) and all rents, income and profits were assigned to M&I Bank.

17.     Also as part of the security for the $40 Million Note and the $20 Million Note, OCP VI and Debtor entered into a Real Estate Mortgage, Assignment, and Security Agreement dated August 1, 2006 in favor of M&I Bank (the "Mortgage and Security Agreement")[1] pertaining to certain real estate (including the Debtor's grove) providing for the grant of a mortgage on the subject property, the grant of a security interest to the extent of any personal property issues, and the assignment of rents, leases, profits and contract rights.[2]

---

[1] Debtor notes that the Mortgage and Security Agreement expressly states that the maximum principal debt, including future advances, secured thereby is $20,000,000. Mortgage and Security Agreement, p. 1. Debtor reserves all rights to challenge the extent, priority, and validity of the liens and security interests of M&I Bank or any other party.

[2] The Mortgage and Security Interest pertains to the Land (as defined therein) and the following additional property:

    (a)     Appurtenances.  The benefit of all tenements, hereditaments, easements and other rights of any nature whatsoever, if any, appurtenant to the Land or the Improvements, or both, the benefit of all rights-of-way, strips and gores of land, streets, alleys, passages, drainage rights, sanitary sewer and potable water rights, stormwater drainage rights, rights of ingress and egress to the Land and all adjoining property, and any improvements of Mortgagor now or hereafter located on any of such real property interests, water and watering rights and powers, oil, gas, mineral and riparian and littoral rights, whether now existing or hereafter arising, together with the reversion or reversions, remainder or remainders, rents, issues, incomes and profits of any of the foregoing (the "Appurtenances").

    (b)     Improvements.     All buildings, structures, betterments and other improvements of any nature now or hereafter situated in whole or in part upon the Land or on the Appurtenances, regardless of whether physically affixed thereto or severed or capable of severance therefrom (the "Improvements").

    (c)     Tangible Property.  All of Mortgagor's right, title and interest, if any, in and to all fixtures, equipment and tangible personal property of any nature whatsoever that is now or hereafter (i) attached, affixed to, or grown on, the Land, the Appurtenances, or the Improvements; or (ii) situated upon or about the Land, the Appurtenances and/or the Improvements; regardless of whether physically affixed thereto or severed or capable of severance therefrom; or (iii) used, regardless of where situated, if used, usable or intended to be used, in connection with any present or future use or operation of or upon the Land. The foregoing includes all goods and inventory, all heating, air conditioning, lighting, incinerating and power equipment; all engines, compressors, pipes, pumps, tanks, motors, ladders, conduits, wiring, and switchboards; all plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, and communications and public address apparatus; all stoves, ovens, ranges, disposal units, dishwashers, water heaters, exhaust systems, refrigerators, cabinets, and partitions; all rugs, draperies and carpets; all laundry equipment; all building materials; all furniture (including, without limitation, any outdoor furniture), furnishings, office equipment and office supplies (but not including furniture, furnishings or office

CLEVELAND/405774v.1

equipment in units used as models or sales offices); all farm product, citrus and other fruits and vegetables, trees, orchards, plants, growing crops, vegetation and all rights related thereto; pesticide, spraying devices, ladders, saws, trimming and pruning devices, farm sprinklers, irrigation pumps, electric motors, engines, pipes and all other irrigation equipment and systems now or hereafter installed or placed on the Land and all other related equipment and machinery, and other items used or useful in connection with the growing or harvesting of fruits or vegetables; all other agricultural products; and all additions, accessions, renewals, replacements and substitutions of any or all of the foregoing. The property interests encumbered and described by this paragraph are called the "Tangible Property" in this Mortgage.

(d)     <u>Rents</u>.  All rents, issues, incomes and profits in any manner arising from the Land, Improvements, Appurtenances or Tangible Property, or any combination thereof, including Mortgagor's interest in and to all leases of whatsoever kind or nature, licenses, franchises and concessions of or relating to all or any portion of the Land, Appurtenances, Improvements or Tangible Property, or the operation thereof, whether now existing or hereafter made, including all amendments, modifications, replacements, substitutions, extensions, renewals or consolidations thereof.  The property interests encumbered and described in this subparagraph are called the "Rents" in this Mortgage.

(e)     <u>Secondary Financing</u>.  All of Mortgagor's right, power or privilege to further encumber any of the Collateral described in this paragraph I , it being intended by this provision to divest Mortgagor of the power to encumber or to grant a security interest in any of the Collateral as security for the performance of an obligation, except for "Permitted Encumbrances" as defined in paragraph 5 herein.

(f)     <u>Proceeds</u>.  All proceeds of the conversion, voluntary or involuntary, of any of the property encumbered by this Mortgage into cash or other liquidated claims, or that are otherwise payable for injury to or the taking or requisitioning of any such property, including all judgments, settlements and insurance and condemnation proceeds as provided in this Mortgage.

(g)     <u>Contract Rights</u>.  All of Mortgagor's right, title and interest in and to any and all contracts or leases, written or oral, express or implied, now existing or hereafter entered into or arising, in any matter related to the improvement, use, operation, sale, conversion or other disposition of any interest in the Land, Appurtenances, Improvements, Tangible Property or the Rents, or any combination thereof, including all tenant leases, sales contracts, reservation deposit agreements, contracts relating to any crops or fruit grown on the Land, Mortgagor's right, title and interest in and to any and all deposits, prepaid items, and payments due and to become due thereunder; and including, without limitation, contracts pertaining to maintenance, on-site security service, elevator maintenance, landscaping services, building or project management, marketing, leasing, sales and janitorial services; Mortgagor's interests as lessee in equipment leases, including telecommunications, computers, vending machines, model furniture, televisions, laundry equipment; Mortgagor's, interests in construction contracts or documents (including architectural drawings and plans and specifications relating to the Improvements), service contracts, use and access agreements, advertising contracts and purchase orders; and Mortgagor's interests in all Fruit Contracts (as defined in that certain Assignment of Fruit Contracts executed by Mortgagor contemporaneously herewith). The property interests encumbered and described in this paragraph are called the "Contract Rights" in this Mortgage. Notwithstanding the foregoing, Bank will not be bound by any of Mortgagor's obligations under any of the foregoing contracts unless and until Bank elects to assume any of such contracts or leases in writing.

(h)     <u>Name</u>.  All right, title and interest of Mortgagor in and to all trade names,

18.     The OCP Entities have provided further security and collateral in favor of M&I Bank for the $40 Million Note, the $20 Million Note and the $5 Million Note. Upon information and belief, M&I Bank is fully secured by the collateral from the OCP Entities as to the Joint Debt.

19.     Based on recent appraisals of the Debtor's grove, Debtor maintains that M&I Bank is over secured as to the $17.6 Million Note and the $1.3 million of the Joint Debt (from the $5 Million Note) properly attributable to the Debtor on an inter-company basis.

## RELIEF REQUESTED

20.     By this Motion, Debtor seeks authority to use cash collateral ("Cash Collateral") as that term is defined in section 363(a) of the Bankruptcy Code and provide adequate protection to secured creditors with an interest in such Cash Collateral. Debtor seeks interim use of Cash Collateral pending a final hearing on this Motion.

---

project names, logos, service marks, trademarks, goodwill, and slogans now or hereafter used in connection with the operation of the Mortgaged Property.

(i)     Other Intangibles. All contract rights, commissions, money, deposits, certificates of deposit, letters of credit, documents, instruments, chattel paper, accounts, and general intangibles (as such terms from time to time are defined in the Uniform Commercial Code as adopted by the State of Florida (the "Uniform Commercial Code")), in any manner related to the construction, use, operation, sale, conversion or other disposition (voluntary or involuntary) of the Land, Appurtenances, Improvements, Tangible Property or Rents, including all construction plans and specifications, architectural plans, engineering plans and specifications, permits, governmental or quasi-governmental approvals, licenses, utility reservations and rights to receive utility services and all rights to and under fees or charges paid by or credits granted to Mortgagor or on its behalf in connection with the Land, Improvements and Appurtenances, developer rights, vested rights under any Planned Unit Development or Development of Regional Impact or other project, zoning, or land use approval, insurance policies, rights of action and other choses in action; provided, however, with respect to reservation deposits, earnest money deposits and down payments made by purchasers or potential purchasers of any or all of the Land, this assignment and Bank's security interest shall be limited to the right, title and interest of Mortgagor, if any, in such reservation deposits, earnest money deposits and down payments.

Mortgage and Security Agreement, § 1.

CLEVELAND/405774v.1

## BASIS FOR RELIEF

21.     In operating its citrus grove, Debtor must expend funds to maintain and protect its orange and grapefruit trees.  Debtor must timely undertake certain actions to ensure maximum yields and safeguard against loss and other risks to production.  The Debtor must make various direct payments in connection with operation of the grove and must make continuing payments to Arcadia and other contractors.

22.     One of the Debtor's pressing concerns is the need for immediate use of Cash Collateral on an interim basis pending a final hearing.  Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary hearing on the motion and authorize the restricted use of Cash Collateral to the extent necessary to avoid immediate and irreparable damage to the Debtor's estate.  Debtor requires the use of Cash Collateral to pay present operating expenses, and to pay service providers, suppliers and other essential vendors in connection with the continued operation and functioning of the Debtor's citrus grove.

23.     The Debtor's ordinary course of operations generates Cash Collateral through the sale of fruit and the receipt of other payments by the Debtor.  M&I Bank asserts a security interest in Debtor's Cash Collateral.[3]

24.     Debtor requires the use of Cash Collateral in order to meet its expenses and maintain the operation of its citrus grove.  Without the use of Cash Collateral, the Debtor's operations will be substantially, immediately and irreparably harmed.  The continued operation of the Debtor's business is essential to its reorganization efforts.

---

[3] Debtor reserves all rights to challenge the validity, priority and perfection of all security interests asserted by any party in any assets of the Debtor.

CLEVELAND/405774v.1

25.     In order to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing on this Motion, the Debtor requires the interim use of Cash Collateral for the period commencing on the Petition Date and continuing through and including September 16, 2011, to pay, among other things, service providers, utilities, insurance, vendors, and other ordinary business costs and expenses.

26.     The Cash Collateral proposed to be used by the Debtor consists of cash on hand, cash to be generated from the continued operation of the Debtor's business, and the receipt of rise payments which are due in connection with prior market changes in the price of oranges.  The Debtor anticipates receipt of a rise payment in September 2011 in the amount of $1.1 million (the "September 2011 Rise Payment").

27.     Debtor believes and maintains that M&I Bank is adequately protected in any Cash Collateral that the Debtor may use.  As adequate protection for any interest in Cash Collateral used by Debtor, the Debtor is willing to grant M&I Bank replacement liens upon, and security interests in, Debtor's post-petition Cash Collateral, to the same extent, amount, type, kind, priority and validity, if any, as existed on the Petition Date, but only to the extent that Debtor diminishes such Cash Collateral.  Debtor shall also pay M&I Bank monthly interest pursuant to (a) the $17.6 Million Note, and (b) the $5 Million Note – but limited to Debtor's intercompany proportionate share of liability at an amount not to exceed $1,303,000,[4] at the current interest rates applied prepetition by M&I Bank (5% compounded monthly), subject to verification by Debtor, resulting in monthly payments of $3,756 due on the 26th day of the month for the $5

---

[4]  Amount determined based on an agreed inter-company sharing percentage of 26.06% as agreed among the Debtor and OCP Entities; however, the sharing percentage was reduced to 18.03% in 2010 but the inter-company loan records were not adjusted.

Million Note and $73,333 due on the 27th day of the month for the $17.6 Million Note. The proposed replacement liens and monthly payment of interest, together with the continued provision of recently required financial reporting to M&I Bank and the maintenance of insurance will provide sufficient adequate protection to prevent any diminution in value to M&I Bank.

28. Debtor seeks to use Cash Collateral in accordance with its proposed budget (with a variance from actual-to-projected disbursements weekly not to exceed 10%, on a cumulative basis), a copy of which is attached hereto as <u>Exhibit A</u> (the "Budget"), for the period from the Petition Date through and including September 16, 2011 (the "Period"), and thereafter upon further order of this Court, following a final hearing on this Motion, on a permanent basis, in accordance with the Debtor's operating needs. In accordance with the Budget, the Debtor projects that its cash collateral will initially diminish and later increase during the Period. The cash that the Debtor shall use during the Period (inclusive of interest payments for August 2011) is estimated at an amount not greater than $291,969, which amount also includes the escrow of accounting and legal fees in the combined amount of $92,000 with payment only upon later Court order.

29. Section 105(a) of the Bankruptcy Code provides that the Court may issue any order "necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Debtor's use of Cash Collateral as permitted by this Motion is essential to its ability to successfully reorganize or accomplish a going concern sale of substantially all of the Debtor's assets.

30. Moreover, section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash

CLEVELAND/405774v.1

collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

31.     Debtor needs immediate authority to use Cash Collateral to fund operations. Authorization to use Cash Collateral is necessary to preserve the continuing production from, and value of, the Debtor's citrus grove.  Use of Cash Collateral is absolutely essential for continued operations and is therefore in the best interest of Debtor's creditors and estate to authorize the use of Cash Collateral.

## NOTICE

32.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region XXI; (ii) the Debtor's secured lenders;  (iii)  counsel for M&I Bank; (iv) the additional creditors identified on the Debtor's list of twenty (20) largest unsecured creditors; (v) other known claimants having liens or security interests in property of Debtor; and (vi) other parties in interest. In light of the nature of the relief requested, Debtor submits that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Debtor respectfully requests that this Court enter an Order, in the form attached hereto as Exhibit B, (i) authorizing the Debtor's use of Cash Collateral on an emergency interim basis and, following a final hearing on this Motion, (ii) authorizing the Debtor to utilize Cash Collateral on a permanent basis without further order of this Court, and (iii) granting the Debtor such other and further relief as is just and equitable.

CLEVELAND/405774v.1

Respectfully submitted,

*/s/ Michael P. Shuster*
Michael P. Shuster (FL Bar No.0051564)
Joseph G. Foster (FL Bar No. 0301980)
PORTER WRIGHT MORRIS & ARTHUR LLP
9132 Strada Place, 3rd Floor
Naples, Florida 34108-2683
Telephone:   (239) 593-2900
Facsimile:   (239) 593-2990
E-mail:      mshuster@porterwright.com
             jfoster@porterwright.com

*Proposed Attorneys for Debtor*
*and Debtor-in-Possession*

CLEVELAND/405774v.1

# EXHIBIT A

## Felda Plantation, LLC
### Cash Collateral Forecast
#### For the Period Beginning July 29, 2011 and Ending September 16, 2011

| | AT FILING | JULY 29, 2011 | AUGUST 5, 2011 | AUGUST 12, 2011 | AUGUST 19, 2011 | AUGUST 26, 2011 | SEPTEMBER 2, 2011 | SEPTEMBER 9, 2011 | SEPTEMBER 16, 2011 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Contracted Fruit - Leks | | | | | | | | | | |
| Contracted Fruit - Ripe Payments | | | | | | | | | | |
| Market Fruit - Leks | | | | | | | | | | |
| Total Cash Receipts | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | |
| Harvesting Costs | | | | | | | | | | |
| Hauling Costs | | | | | | | | | | |
| **Grove Management and Maintenance** | | | | | | | | | | |
| Supervision | | | | | | | | | | |
| Supervision Vehicle | | | | 50,000 | | | | 40,000 | | 90,000 |
| ACE Office Expenses | | | | | | | | | | |
| ACE Shop Supplies | | | | | | | | | | |
| Security Checks | | | | | | | | | | |
| Trailer Loading | | | | | | | | | | |
| Production Chemicals and Mixing | | | | | | | | | | |
| Caretaker Expense | | | | | | | | | | |
| Field Expenses | | | | | | | | | | |
| Repairs and Maintenance - Equipment | | | | | | | | | | |
| Tractor Operator | | | | | | | | | | |
| ACE Tractor Operator | | | | | | | | | | |
| Grove Scouting | | | | | | | | | | |
| Backhoe Operator | | | | | | | | | | |
| Mower Operator | | | | | | | | | | |
| Repairs and Maintenance - Irrigation | | | | | | | | | | |
| Hand Labor - Irrigation | | | | | | | | | | |
| Irrigation Pump Maintenance | | | | | | | | | | |
| Total/Grove Management and Maintenance | | | | 50,000 | | | | 40,000 | | 90,000 |
| **Production Materials** | | | | | | | | | | |
| Miticide | | | | | | | | | | |
| Fertilizer | | | | | | | | | | |
| Spray | | | | | | | | | | |
| Pesticide | | | | | | | | | | |
| Herbicide | | | | | | | | | | |
| Insecticide | | | | | | | | | | |
| Fungicide | | | | | | | | | | |
| Total Production Materials | | | | | | | | | | |
| Fuel and Lubrication | | | 80 | | | | 80 | | | 160 |
| Topping and Hedging | | | 60 | | | | 60 | | | 120 |
| Repairs and Maintenance | | | | | | | | | | |
| Restroom Rental | | | | | | | | | | |
| Utilities - Groves | | | | | | | | | | |
| Supplies - Groves | | | | | | | | | | |
| Insurance - Liability, Tree, and Crop | | | | | | | | | | |
| Engineering Fees | | | | | | | | | | |
| Real Estate Taxes | | | | | | | | | | |
| Tangible Taxes | | | | | | | | | | |
| Finance Charges | | | | | | | | | | |
| Bank Charges | | | 50 | | | | 50 | | | 100 |
| Supplies - Office | | | | | | | | | | |
| Licenses and Fees | | | | | | | | | | |
| Professional Fees - Office - Accounting | | | 15,000 | | | | 12,000 | | | 27,000 |
| Professional Fees - Office - Legal | | | 40,000 | | | | 25,000 | | | 65,000 |
| Professional Fees - Office - Management | | | 15,000 | | | | 15,000 | | | 30,000 |
| Utilities - Office | | | | | | | | | | |
| Rent | | | 2,500 | | | | | | | 2,500 |
| Interest - M&I Bank - $17.6 MM | | | | | | 73,333 | | | | 73,333 |
| Interest - M&I Bank - $5 MM - Felda Portion | | | | | | 3,756 | | | | 3,756 |
| Total Disbursements | | | 72,690 | 50,000 | | 77,089 | 52,190 | 40,000 | | 291,969 |
| Net Cash | | | (72,690) | (50,000) | | (77,089) | (52,190) | (40,000) | | (291,969) |
| **Accounts Receivable** | | | | | | | | | | |
| Opening Balance | 1,154,564 | 1,154,564 | 1,154,564 | 1,154,564 | 1,154,564 | 1,154,564 | 1,100,000 | 1,100,000 | | |
| Sales | | | | | | | | | | |
| Less Receipts | | | | | | (54,564) | | (1,100,000) | | |
| Closing Balance | 1,154,564 | 1,154,564 | 1,154,564 | 1,154,564 | 1,154,564 | 1,100,000 | 1,100,000 | | | |
| **Cash** | | | | | | | | | | |
| Opening Balance | 45,959 | 45,959 | 45,959 | (26,731) | (76,731) | (76,731) | (99,256) | (151,446) | 908,554 | |
| Net Cash | | | (72,690) | (50,000) | | (22,525) | (52,190) | 1,060,000 | | |
| Closing Balance | 45,959 | 45,959 | (26,731) | (76,731) | (76,731) | (99,256) | (151,446) | 908,554 | 908,554 | |
| **Cash Collateral** | 1,200,523 | 1,200,523 | 1,127,833 | 1,077,833 | 1,077,833 | 1,000,744 | 948,554 | 908,554 | 908,554 | |
| Change in Cash Collateral | | | (72,690) | (50,000) | | (77,089) | (52,190) | (40,000) | | (291,969) |

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

In re:

Felda Plantation, LLC,

        Debtor.

_____/

Chapter 11

Case No.

Judge

**INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO BANKRUPTCY CODE SECTION 363 AND GRANTING ADEQUATE PROTECTION PURSUANT TO BANKRUPTCY CODE SECTIONS 361 AND 363**

THIS CASE came on for consideration of the *Motion of Debtor and Debtor-in-Possession for Order Authorizing Interim and Permanent Use of Cash Collateral and Granting Adequate Protection* (the "Motion")[1] [Docket No. __], filed by Felda Plantation, LLC ("Debtor"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case, by and through its proposed counsel, for entry of an order (a) authorizing interim and permanent use of Cash Collateral pursuant to Bankruptcy Code Section 363 and granting adequate protection pursuant to Bankruptcy Code Sections 361 and 363, and (b) seeking an emergency hearing on the Motion to consider the entry of an interim order pursuant to Bankruptcy Rule 4001 (this "Order") authorizing Debtor, *inter alia*, to use the Cash Collateral, all upon the terms and conditions set forth herein pending the Final Hearing referred to below; and (c) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order (the "Final Order") authorizing

on a final basis, *inter alia*, the use of the Cash Collateral; and after due deliberation and hearing, this Court finds that: (i) it has jurisdiction over the matters raised in the Motion under 28 U.S.C. §§ 157 and 1334; (ii) venue of this matter is proper under 28 U.S.C. §§ 1408 and 1409; (iii) this matter is a core proceeding under 28 U.S.C. § 157(b)(2); (iv) the relief requested in the Motion is in the best interests of Debtor, its estate, creditors, and other parties in interest; (v) adequate and proper notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary; and (vi) good and sufficient cause exists for the granting of the relief requested in the Motion as set forth herein. Accordingly, it is hereby

**ORDERED** that:

1. The Motion is GRANTED on an interim basis.

2. To the extent that M&I Bank has a valid, perfected and enforceable security interests in Debtor's cash collateral ("Cash Collateral") as that term is defined under Bankruptcy Code Section 363(a), Debtor may use Cash Collateral for the period commencing on the Petition Date to pay those items delineated in the budget attached to this Order as <u>Exhibit A</u> (with a variance from actual-to-projected disbursements weekly not to exceed 10%, on a cumulative basis) (the "Budget") through and including September 16, 2011.

3. As adequate protection for any such interest in Cash Collateral used by Debtor, M&I Bank is granted replacement liens upon, and security interests in, Debtor's post-petition Cash Collateral, to the same extent, amount, type, kind, priority and validity,

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Motion.

2

if any, as existed on the Petition Date, but only to the extent that Debtor diminishes such Cash Collateral. Debtor shall make interest payments to M&I Bank as provided in the Budget and shall timely provide required reporting information to M&I Bank. Debtor shall otherwise continue existing insurance coverage.

4. A further hearing to consider the Motion is scheduled for _____, 2011, at _____, prevailing Eastern Time. Any objections to the further use of Cash Collateral must be filed with the Bankruptcy Court and served upon counsel for the Debtor on or before _____, 2011.

5. A copy of this Order shall be served by Debtor or their counsel, by regular mail on (i) the Office of the United States Trustee for Region XXI; (ii) the Debtor's secured lenders; (iii) counsel for M&I Bank; (iv) the additional creditors identified on the Debtor's list of twenty (20) largest unsecured creditors; (v) other known claimants having liens or security interests in property of Debtor; (vi) all persons requesting notices in the Debtor's case; (vii) the Internal Revenue Service; and (viii) the Securities and Exchange Commission, within five (5) days of entry of this Order.

6. If notice is given in the manner provided herein, said notice shall be sufficient and proper and in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court.

7. Nothing in the Motion or this Order shall be construed to impair Debtor's right, or the rights of Debtor's estate, to contest the validity, priority, perfection or amount of any claimed security interest of M&I Bank.

8. This Order shall be immediately effective and enforceable upon entry.

3

**DONE** and **ORDERED** in Chambers at Ft. Myers, Florida, on

_____.


_____

UNITED STATES BANKRUPTCY JUDGE

Prepared and Submitted by:


*/s/ Michael P. Shuster*_____
Michael P. Shuster (FL Bar No.0051564)
Joseph G. Foster (FL Bar No. 0301980)
PORTER WRIGHT MORRIS & ARTHUR LLP
9132 Strada Place, 3rd Floor
Naples, Florida 34108-2683
Telephone:    (239) 593-2900
Facsimile:   (239) 593-2990
E-mail:       mshuster@porterwright.com
              jfoster@porterwright.com

*Proposed Attorneys for Debtor*
*and Debtor-in-Possession*



Copies to:

CLEVELAND/405774v.1

# EXHIBIT A

**(Budget)**